# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THOMAS CRONIN, SIERRA ALLEN, and CHERE ADAMS,** on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| **ALVARIA, INC. and CARRINGTON MORTGAGE SERVICES, LLC,** | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Thomas Cronin, Sierra Allen, and Chere Adams, individually and on behalf of all similarly situated persons, allege the following against Carrington Mortgage Services, LLC ("CMS") and Alvaria, Inc. ("Alvaria") (collectively, "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

### I.      INTRODUCTION

1.      Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard Plaintiffs' and other similarly situated CMS customers' ("Class Members") personally identifiable information ("PII"), including full names, telephone numbers, loan

numbers and balances, mailing addresses, and last four digits of Social Security numbers (the "Private Information"), from unauthorized disclosure to cybercriminals.[1]

2.     Defendant CMS is a fully integrated mortgage company with lending and servicing operations.[2] Headquartered in California, CMS services loans in all fifty (50) states and Puerto Rico and is licensed to lend in 48 states.[3]

3.     Alvaria touts itself as a "global leader delivering optimized customer experience and workforce engagement software and cloud service technology solutions, "help[ing] companies create better experiences for their customers and employees who serve them."[4]

4.     Plaintiffs bring this class action lawsuit to address Defendants' collective inadequate safeguarding and supervision of Class Members' Private Information that they collected and maintained, including but not limited to, Defendants' failure to comply with industry standards to protect Plaintiffs' and Class Members' Private Information and to provide adequate notice to Plaintiffs and Class Members that their PII had been compromised following the March 9, 2023 attack on Alvaria's customer environment (the "Data Breach").

5.     Plaintiffs seek, among other things, orders requiring Defendants to fully and accurately disclose the nature of the information that was compromised and to adopt sufficient security practices and safeguards to prevent incidents like the Data Breach from occurring again in the future.

---

[1] *See* https://nextmortgagenews.com/news/tech-vendor-names-carrington-in-data-breach-notice/ (last visited on May 7, 2023).

[2] *See* https://www.carringtonmortgage.com/our-mission (last visited on May 7, 2023).

[3] *Id*.

[4] *See* https://www.alvaria.com/company/about-alvaria (last visited on May 7, 2023).

6.     Plaintiffs and Class Members would not have provided their Private Information to Defendants if they had known that Defendants would breach their privacy promises and agreements by (a) failing to ensure that they had adequate data security measures in place that would protect the Private Information from compromise and exfiltration, and/or (b) knowingly providing Plaintiffs' and Class Members' PII to a vendor that utilized inadequate security measures.

7.     Armed with the Private Information accessed in the Data Breach, data thieves can and will commit a variety of crimes against Plaintiffs and Class Members, including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

8.     There has been no assurance offered by Defendants that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their data security practices sufficient to avoid a similar breach of their network in the future.

9.     Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, including out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

10.     Plaintiffs bring this class action lawsuit to address Defendants' inadequate safeguarding and supervision of Class Members' Private Information that they collected and

maintained. The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, thus Defendants were on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

11.     Upon information and belief, Defendants and their employees and vendors failed to properly monitor the computer network and systems that housed the Private Information. Had they properly monitored their networks and provided adequate supervision over their agents, vendors, and/or suppliers, the Data Breach could have been prevented.

12.     Plaintiffs' and Class Members' identities are now at risk because of Defendants' negligent conduct as the Private Information that Defendants collected and maintained is now in the hands of data thieves and other unauthorized third parties.

13.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

## II.     PARTIES

14.     Plaintiff Thomas Cronin, is, and at all times mentioned herein was, an individual citizen of the State of Pennsylvania.

15.     Plaintiff Sierra Allen, is, and at all times mentioned herein was, an individual citizen of the State of Illinois.

16.     Plaintiff Chere Adams is, and at all times mentioned herein was, an individual citizen of the State of Florida.

17.     Defendant Alvaria, Inc. is a business software company incorporated in Delaware, with its principal place of business at 5 Technology Park Dr, Westford, Massachusetts 01886 in Middlesex County.

18.     Defendant CMS is a fully integrated mortgage company headquartered at 1600 South Douglass Road, Suites 110 & 200-A, in Anaheim, California 92806 in Orange County.

### III.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over the parties and the subject matter of this action. Jurisdiction is proper because Defendant Alvaria is a corporation operating throughout the nation whose principal place of business is in the state of Massachusetts and because CMS conducts business in and has sufficient minimum contacts with the State of Massachusetts, including but not limited to, through its sharing of members' personal information with Alvaria and working with Alvaria to attempt to keep such information private and secure.

20.     This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and Plaintiffs and members of the Class are citizens of states that differ from Defendant.

21.     Venue is proper in this District because the acts and omissions complained of herein occurred (and Defendant Alvaria is located) within this District. Upon information and belief, Plaintiffs' and Class Members' Private Information was also being maintained within this District.

### IV.     FACTUAL ALLEGATIONS

#### A.  *Defendants' Business and Collection of Plaintiffs' and Class Members' Private Information*

22.     Founded in 2007, CMS is a fully integrated mortgage company with lending and servicing operations throughout the country. In fact, CMS services loans in all fifty (50) states and Puerto Rico and is licensed to lend in 48 states.

23.     Alvaria is a workforce management and call center technology solution headquartered in Massachusetts.[5]

24.     As a condition of receiving loan servicing and other mortgaging services, CMS requires that its customers turn over highly sensitive personal information. In its "Privacy Policy", CMS makes clear that it "do[es] not rent, sell, or share with third parties the Personal Information [it] collect[s]" from its customers except for in the case of "third party vendors" engaged to provide services on CMS's behalf, "such as hosting, web-site development, and support, have access to Personal Information."[6] Importantly, CMS acknowledges in the Privacy Policy that its vendors, including Alvaria, "have agreed not to disclose the Personal Information or to use it for any purpose other than providing the requested services."[7]

25.     In Alvaria's Privacy Policy, it promises to only share or Plaintiffs' and Class Members' Private Information "if such disclosure is in accordance with this Privacy Policy and provided that it is lawful to do so."[8]

26.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties owed to them and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

27.     Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendants ultimately failed to do.

---

[5] *See* https://www.alvaria.com/company/about-alvaria (last visited on May 7, 2023).

[6] *See* https://www.carringtonmortgage.com/legal/privacy-policy (last visited on May 7, 2023).

[7] *Id.*

[8] *See* https://www.alvaria.com/legal/privacy-policy (last visited on May 7, 2023).

### B. *The Data Breach*

28.     On November 28, 2022, the Hive Ransomware group executed a ransomware attack on Alvaria's internal corporate network. It was learned on December 21, 2022 that criminal actors released certain corporate records onto the dark web. Subsequently, on March 9, 2023, Alvaria was the victim of a second attack on a portion of its customer environment that maintained Plaintiffs' and Class Members' Private Information.

29.     Despite the November 28, 2022 data breach, Defendant CMS continued to utilize Alvaria's services as its vendor.

30.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including loan numbers and loan balances, mailing addresses, and the last four digits Social Security numbers.

31.     Alvaria delivered Notices of Data Incident letters to Plaintiffs and Class Members, alerting them that their highly sensitive Private Information had been exposed.

32.     Defendants had obligations created by contract, industry standards, common law, federal and state regulations, and representations made to Plaintiff and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

33.     Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such Information confidential and secure from unauthorized access.

34.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

35.     Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

### C.  Defendants Failed to Comply with FTC Guidelines

36.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

37.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

38.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for

suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

39.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

40.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

41.     Defendants were at all times fully aware of their obligation to protect the Private Information of their members yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### D.  Defendants Breached Their Duty to Safeguard Plaintiffs' and Class Members' Private Information

42.     In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols (and those of their business associates, vendors, and/or suppliers) adequately protected the Private Information of Class Members.

43.     Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data (or, in the case of CMS, those of its vendor, Alvaria). Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a.   Failing to adequately protect Plaintiffs' and Class Members' Private Information;

   b.   Failing to sufficiently train and/or monitor their employees and/or vendors regarding the proper handling of Plaintiffs' and Class Members' Private Information;

   c.   Failing to fully comply with FTC guidelines for cybersecurity, in violation of the FTCA; and

   d.   Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

44.     Had Defendants remedied the deficiencies in their information storage and security practices, procedures, and protocols, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented the theft of Plaintiffs' and Class Members' confidential Private Information.

45.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft.

### E.  Defendants Should Have Known that Cybercriminals Target PII to Carry Out Fraud and Identity Theft

46.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such

as data breaches or unauthorized disclosure of data.[9] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

47.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

48.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

49.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

---

[9] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on April 28, 2023).

Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

50.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[10]

51.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

52.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

---

[10] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited on May 7, 2023).

53.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' compromised Private Information to access accounts, including, but not limited to, email accounts and financial accounts, in order to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

54.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[11] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

55.     Identity thieves can also use stolen personal information such as Social Security numbers (or even the last four digits of an individual's Social Security number)[12] for a variety of crimes. Indeed, scammers only need the last four digits of a Social Security number coupled with other PII to commit fraud, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government and/or medical benefits, or to file a fraudulent tax return using the victim's

---

[11] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited April 28, 2023).

[12] *See* https://www.earncheese.com/post/the-last-4-digits-of-your-ssn#:~:text=As%20long%20as%20a%20hacker,tax%20refunds%20in%20your%20name (last visited on May 7, 2023).

information.[13] In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

56.     Even with the last four digits of a Social Security number, cybercriminals can easily use complex computer algorithms to guess the remaining five digits.[14]

57.     In fact, a study by the Identity Theft Resource Center[15] shows the multitude of harms caused by fraudulent use of PII:



<hr>

[13] *See* https://consumerboomer.com/what-can-a-scammer-do-with-the-last-4-digits-of-your-social/ (last visited on May 7, 2023).

[14] *See* "Social Security Numbers Are Easy to Guess," https://www.science.org/content/article/social-security-numbers-are-easy-guess (last visited on May 7, 2023).

[15] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited on April 28, 2023).

58.     The ramifications of Defendants' failure to keep Plaintiffs' and Class Members' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

59.     Here, the last four digits of Social Security numbers were compromised (along with other highly sensitive PII). The value of such PII is axiomatic. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

60.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[16]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

61.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

62.     As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future and have no choice but to vigilantly monitor their accounts for many years to come.

---

[16] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited April 28, 2023).

### F. *Plaintiffs' and Class Members' Damages*

63.     Plaintiffs and Class Members, as customers of CMS, have been damaged by the compromise of their Private Information in the Data Breach.

64.     Plaintiffs and Class Members entrusted their Private Information to Defendants in order to receive Defendants' services.

65.     Plaintiffs' Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices, procedures, and protocols, as discussed herein.

66.     As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

67.     Further, as a direct and proximate result of the Data Breach, Plaintiffs and Class Members have been forced to expend time dealing with and attempting to mitigate the negative effects thereof.

68.     Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

69.     The Private Information maintained by and stolen from Defendants' system, combined with publicly available information, allows nefarious actors to assemble a detailed

mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against them.

70.     Additionally, Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and records, including medical records and explanations of benefits, for misuse.

71.     Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

    a.   Monitoring for and discovering fraudulent charges;

    b.   Canceling and reissuing credit and debit cards;

    c.   Purchasing credit monitoring and identity theft prevention;

    d.   Addressing their inability to withdraw funds linked to compromised accounts;

    e.   Placing "freezes" and "alerts" with credit reporting agencies;

    f.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    g.   Contacting financial institutions and closing or modifying financial accounts;

    h.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    i.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

    j.   Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

72.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants and their business associates, vendors, and/or suppliers, is protected from future breaches by the implementation of more adequate data security measures and safeguards.

73.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.    <u>CLASS ACTION ALLEGATIONS</u>

74.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

75.    Specifically, Plaintiffs propose the following Nationwide Class (also referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

All persons residing in the United States who had Private Information stolen as a result of the Data Breach, including all who were sent a notice of the Data Breach.

76.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal

representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

77. Plaintiffs reserve the right to modify or amend the definition of the proposed Class and/or add subclasses before the Court determines whether certification is appropriate.

78. <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact identities of Class Members are unknown at this time, based on information and belief, the Class consists of roughly 3,037,303 individuals whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

79. <u>Commonality</u>. There are questions of law and facts common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.  Whether Defendants engaged in the conduct alleged herein;

      b.  Whether Defendants' conduct violated the FTCA;

      c.  Whether and to what extent Defendants had a duty to protect the Private Information of Class Members;

      d.  When Defendants learned of the vulnerability within Alvaria's network that led to the Data Breach;

      e.  Whether Defendants' response to the Data Breach was adequate;

      f.  Whether Defendants took reasonable steps and measures to safeguard Plaintiffs' and Class Members' Private Information;

g.  Whether Defendants breached their duty to Class Members to safeguard their Private Information;

h.  Whether hackers obtained Class Members' Private Information via the Data Breach;

i.  Whether Defendants knew or should have known that their data monitoring and supervision processes were deficient;

j.  Whether Defendants were aware that their business associates', vendors', and/or suppliers' data security practices, procedures, and protocols were inadequate;

k.  What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

l.  Whether Defendants' conduct was negligent;

m.  Whether Defendants were unjustly enriched;

n.  Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

o.  Whether Plaintiffs and Class Members are entitled to lifetime credit or identity monitoring and monetary relief; and

p.  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

80.  <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*,

all Class Members were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

81.   Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

82.   Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way and as a result of the same negligent acts and omissions committed by Defendants. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

83.   Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

84.     Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

85.     Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

86.     Plaintiffs restate and reallege all of the allegations in paragraphs 1-128 as if fully set forth herein.

87.     Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

88.     Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that the Private Information would be an attractive target for cyberattacks.

89.     Defendants owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, supervising, monitoring, and protecting the Private Information in their possession;

b.  To protect members' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c.  To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

d.  To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to the FTCA;

e.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.  To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

90.     Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

91.     Defendants' duty also arose because Defendants were bound by industry standards to protect their respective customers' confidential Private Information entrusted to them.

92.     Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants and their associates, vendors, and/or suppliers, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

93.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within their care.

94.     Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate data security practices to safeguard the Private Information of Plaintiffs and Class Members.

95.     Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of the Private Information;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to comply with the FTCA; and

e. Failing to comply with other state laws and regulations, as further set forth herein.

96.     Defendants had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions.

97. Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised, exfiltrated, and misused, as alleged herein.

98. As a result of Defendants' ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

99. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

100. As a result of Defendants' negligence in breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

101. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

102. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

103. The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

104. Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

105.     In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security monitoring procedures, conduct periodic audits of those procedures, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**<u>COUNT II</u>**
**BREACH OF CONTRACT**
**(AGAINST CMS ON BEHALF OF PLAINTIFFS AND THE CLASS)**

106.     Plaintiffs restate and reallege the allegations in paragraphs 1-128 as if fully set forth herein.

107.     Plaintiffs and Class Members entered into a valid and enforceable contract through which they were required to turn over their Private Information to CMS in exchange for services. That contract included promises by CMS to secure, safeguard, and not disclose Plaintiffs' and Class Members' Private Information to any third parties without their consent.

108.     CMS's Privacy Policy memorialized the rights and obligations of CMS and its customers. This document was provided to Plaintiff and Class Members in a manner in which it became part of the agreement for services.

109.     In its Privacy Policy, CMS commits to protecting the privacy and security of the Private Information and promises to never share Plaintiffs' and Class Members' Private Information except under certain limited circumstances.

110.     Plaintiffs and Class Members fully performed their obligations under their contracts with CMS. However, CMS failed to secure, safeguard, and/or keep private Plaintiffs' and Class Members' Private Information, and therefore CMS breached its contracts with Plaintiffs and Class Members.

111.    Despite its knowledge of Alvaria's previous lax data security measures that led to at least one previously known data breach in November of 2022, CMS allowed Alvaria to maintain possession and control of Plaintiffs' and Class Members' Private Information, leading to criminal third parties' access to, copy, and/or exfiltrate of Plaintiffs' and Class Members' Private Information without permission through CMS's failure to adequately vet and supervise Defendant Alvaria. Therefore, CMS breached its contracts with Plaintiffs and Class Members.

112.    CMS's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTCA, resulted in CMS providing services to Plaintiffs and Class Members that were of a diminished value and in breach of its contractual obligations to Plaintiffs and Class Members.

113.    As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein, including by CMS's failure to fully perform its part of the agreement with Plaintiffs and Class Members.

114.    As a direct and proximate result of CMS's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

115.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring CMS to, *inter alia*, strengthen its data security monitoring and supervision procedures, conduct periodic audits of those procedures, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

<u>COUNT III</u>
**BREACH OF IMPLIED CONTRACT**
**(AGAINST CMS ON BEHALF OF PLAINTIFFS AND THE CLASS)**

116.    Plaintiffs restate and reallege the allegations in paragraphs 1-128 as if fully set forth herein.

117.    This Count is pleaded in the alternative to Count II above.

118.    CMS provides mortgage services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with CMS regarding the provision of those services through its collective conduct, including by Plaintiffs and Class Members providing their Private Information to CMS in exchange for the services offered.

119.    Through CMS's offering of these services, it knew or should have known that it needed to protect Plaintiffs' and Class Members' confidential Private Information in accordance with its own policies, practices, and applicable state and federal law.

120.    As consideration, Plaintiffs and Class Members turned over valuable Private Information to CMS. Accordingly, Plaintiffs and Class Members bargained with CMS to securely maintain and store their Private Information.

121.    CMS accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services, including data security, to Plaintiffs and Class Members.

122.    In delivering their Private Information to CMS in exchange for its services, Plaintiffs and Class Members intended and understood that CMS would adequately safeguard the Private Information as part of those services.

123.    CMS's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information, including its business associates, vendors, and/or suppliers, also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its business associates, vendors, and/or suppliers is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees, business associates, vendors, and/or suppliers; (4) designing and implementing appropriate retention policies to protect

the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

124.     Plaintiffs and Class Members would not have entrusted their Private Information to CMS in the absence of such an implied contract.

125.     Had CMS disclosed to Plaintiffs and the Class that it did not have adequate data security and data supervisory practices to ensure the security of their sensitive data, including but not limited to CMS's decision to continue to entrust Plaintiffs' and Class Members' Private Information to Alvaria despite Alvaria's November 2022 data breach, Plaintiffs and Class Members would not have provided their Private Information to CMS.

126.     As providers of lending and mortgage servicing operations, CMS recognized (or should have recognized) that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the Class.

127.     CMS violated these implied contracts by failing to employ reasonable and adequate security measures and supervision of its vendors, business associates, and/or suppliers to secure Plaintiffs' and Class Members' Private Information.

128.     A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide accurate and complete Private Information to CMS in exchange for CMS's agreement to, *inter alia*, protect their Private Information.

129.     Plaintiffs and Class Members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT IV**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(AGAINST ALVARIA ON BEHALF OF PLAINTIFFS AND THE CLASS)**

130.   Plaintiffs restate and reallege the allegations in paragraphs 1-128 as if fully set forth herein.

131.   Alvaria is a workforce management and call center technology solution company.

132.   Alvaria entered into a contract with CMS in which it promised not to ever disclose Plaintiffs' and Class Members' Private Information or to use it for any purpose other than the services requested by CMS.

133.   This contract was made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Alvaria agreed to collect and promised CMS it would protect.

134.   Alvaria knew that if it were to breach this contract with CMS, then CMS's customers, including Plaintiffs and Class Members, would be harmed.

135.   Alvaria breached its contract with CMS when it failed to use reasonable data security measures, including those in compliance with the FTCA and industry standards, that could have prevented the Data Breach.

136.   As foreseen, Plaintiffs and the Class were harmed by Alvaria's breach, as set forth herein.

137.   Accordingly, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorney's fees incurred in this action.

**COUNT V**
**UNJUST ENRICHMENT/QUASI CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

138.   Plaintiffs restate and reallege the allegations in paragraphs 1-128 as if fully set forth herein.

139.    Plaintiffs and Class Members conferred a benefit on Defendants. Specifically, they provided Defendants with their Private Information, which Private Information has inherent value. In exchange, Plaintiffs and Class Members should have been entitled to Defendants' adequate protection and supervision of their Private Information, especially in light of their special relationship.

140.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit by accepting and retaining the Private Information entrusted to them. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

141.    Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

142.    Defendants acquired the Private Information through inequitable record retention as it failed to disclose the inadequate data security practices, procedures, and protocols previously alleged.

143.    If Plaintiffs and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to secure their Private Information, they would have made alternative mortgage servicing choices that excluded Defendants.

144.    Plaintiffs and Class Members have no adequate remedy at law.

145.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

146.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and/or will suffer injury, including but not limited to: (i) the imminent and

31

substantial risk of actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

147.   Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct alleged herein. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

148.   Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VII**
**INJUNCTIVE/DECLARATORY RELIEF**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

149.    Plaintiffs restate and reallege the allegations in paragraphs 1-128 as if fully set forth herein.

150.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described in this Complaint.

151.    Defendants owe a duty of care to Plaintiffs and Class Members, which required them to adequately monitor and safeguard Plaintiffs' and Class Members' Private Information.

152.    Defendants and/or their associates, vendors, and/or suppliers still possess the Private Information belonging to Plaintiffs and Class Members.

153.    Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

154.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure their members' Private Information under common law, the FTCA, and industry standards;

b.    Defendants' existing data monitoring measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security

procedures and practices that are appropriate to protect members' Private Information; and

c.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure members' Private Information.

155.  This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect members' Private Information, including the following:

a.  Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b.  Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii.  engaging third-party security auditors and internal personnel to run automated security monitoring;

iii.  auditing, testing, and training their security personnel regarding any new or modified procedures;

iv.          segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

v.          conducting regular database scanning and security checks;

vi.          routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.          meaningfully educating their users about the threats they face with regard to the security of their Private Information, as well as the steps Defendants' members should take to protect themselves.

156.    If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

157.    The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

158.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at

Defendants, thus preventing future injury to Plaintiffs and other members whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a.   An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the California Class requested herein;

b.   Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.   An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.   An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.   An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.   A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.   An award of such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all triable issues.


DATED:  May 8, 2023                    Respectfully submitted,


                                       <u>/s/ Christina Xenides</u>
                                       Christina Xenides, Esq.
                                       **SIRI & GLIMSTAND LLP**
                                       1005 Congress Avenue, Suite 925-C36
                                       Austin, TX 78701
                                       Tel: (512) 265-5622
                                       E: cxenides@sirillp.com


                                       Mason A. Barney (*pro hac vice* to be filed)
                                       Tyler J. Bean (*pro hac vice* to be filed)
                                       **SIRI & GLIMSTAD LLP**
                                       745 Fifth Avenue, Suite 500
                                       New York, New York 10151
                                       Tel: (212) 532-1091
                                       E: mbarney@sirillp.com
                                       E: tbean@sirillp.com